```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------- X
                                          :
UNITED STATES OF AMERICA,                 :
                                          :
                                          :     24cr497-2(DLC)
              -v-                         :
                                          :     OPINION AND
BIANNEURY PENA,                           :        ORDER
                                          :
                        Defendant.        :
                                          :
----------------------------------------- X
```

APPEARANCES:

For the United States of America:
Ashley Carolyn Nicolas
Ryan Wolfe Allison
United States Attorney's Office for the
Southern District of New York
26 Federal Plaza, 37th Floor
New York, NY 10007


For defendant Bianneury Pena:
Martin Spencer Bell
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017

DENISE COTE, District Judge:

     The defendant Bianneury Pena has moved to suppress the fruits of a search conducted on June 7, 2024.  For the following reasons, the motion is denied.

## Background

The following facts are undisputed.  To the extent there has been any factual dispute, it is addressed in the discussion that follows.

In November of 2023, the Drug Enforcement Administration ("DEA") began investigating a homicide that had occurred on November 4 in an apartment used to distribute illegal drugs.  Abel Rosario's cellphone, which was found near the murder site, contained photographs of guns and drugs.

The DEA surveilled Rosario and his new cellphone.  On May 9, 2024, DEA learned that the cellphone was traveling from North Carolina to New York.  DEA agents then observed Rosario exit an interstate passenger bus carrying a heavy bag, or as the Government agents describe it, a "weighted" bag.  A man, later identified as Pena, accompanied him.  DEA Agents had previously seen the two men together.

On May 19, DEA agents observed Pena, Rosario and a third person enter an apartment building in Newark, New Jersey where the agents have learned that Pena lived.  Rosario was carrying a heavy piece of dark blue carry-on luggage.  The following day, another person threw that luggage, now empty, into the garbage.  It was seized by law enforcement.  Stuey, a sniffer dog trained to alert to the presence of narcotics, sat down next to the bag.

This was a positive signal for the presence of narcotics or their odor.

On June 6, while monitoring Rosario's cellphone, DEA observed that cellphone was traveling again from North Carolina to New York. Early in the morning of June 7, the DEA agents watched Pena, Rosario and another person exit a passenger bus in Chinatown in Manhattan and interact with each other. Pena was carrying a heavy duffel bag and Rosario was carrying a heavy backpack. The agents approached the three men, identified themselves, and placed the three men in handcuffs.

Stuey and his certified handler Officer Kirk Kouzis of the Port Authority of New York and New Jersey Police had been in a vehicle waiting for the bus to arrive. Officer Kouzis is a member of the DEA Task Force unit investigating Rosario. As described below, Officer Kouzis arranged the duffel bag and backpack for Stuey to sniff them. About sixteen minutes after the bus had arrived, Officer Kouzis led Stuey to sniff the two bags. Stuey's actions were the subject of a suppression hearing and are described below.

Thereafter, the DEA arrested the three men. The Government immediately applied for a search warrant for the bags. The affidavit in support of the search warrant was signed by a task force officer with the DEA and represents that "Stuey, guided by his handler from the Port Authority Police Canine Unit, sniffed

3

each of Bag-1 and Bag-2 separately.  Stuey sat down next to each of Bag-1 and Bag-2, indicating a positive alert for narcotics odor in both."  The warrant issued, the bags were searched, and guns and ammunition were found in each bag.  A Magistrate Judge authorized an arrest complaint on June 7 for Rosario but not for Pena.

On June 18, a Magistrate Judge authorized a search of the cellphone seized from Pena on June 7.  On September 5, this Court authorized a search for location data for Pena's cellphone for the period of May 1 to June 8, 2024.  Pena's cellphone contains photographs of firearms and money and audio messages regarding drug trafficking.

Rosario was indicted on August 21, 2024.  Pena was charged in a superseding indictment on October 31, 2024 with participating in a firearms trafficking conspiracy in violation of 18 U.S.C. §§ 933(a)(1) and (a)(2).  At a conference on December 5, Pena's trial date was set for July 15, 2025, which was the date previously set for Rosario's trial.

On February 26, Pena's counsel filed the instant motion to suppress.  It was supported by an affidavit from Pena, who stated that after the agents detained him, he was moved against a wall with his back "turned away from the dog."  Pena asserts that he looked over his shoulder and saw the dog sniff both bags

4

but sit down only after sniffing the bag Rosario had been carrying.

The Government opposed the motion on March 12.  A suppression hearing was held on April 16.  The Government called Officer Kouzis; the defendant called no witnesses.  At the conclusion of the hearing, the Court orally denied the motion to suppress.

## Discussion

The defendant makes essentially two arguments in support of his motion to suppress the search of the bag carried by Pena. He argues that there was no reasonable suspicion to stop Pena on June 7, 2024.  He also argues that the stop, even if initially legal, became an illegal arrest made without probable cause. Before addressing those two arguments, this Opinion will describe what occurred on the morning of Pena's arrest.

Officer Kouzis and Stuey were part of the DEA task force team that waited for the bus carrying Rosario and Pena on the morning of June 7, 2024.  The bus arrived in Chinatown, near Canal Street, and released its passengers.  Rosario and Pena stepped off the bus with another person.  Rosario and Pena were each carrying a bag.  The agents took the two bags from Rosario and Pena and detained all three men.  The three men were taken

5

to separate cars while Officer Kouzis conducted a canine search of the two bags.

Officer Kouzis took the two bags seized from Rosario and Pena and placed them separately along a viaduct wall. The area looked as if it were part of a homeless encampment. There was trash, a sleeping bag, a trash can, and a fire hydrant along the wall. Officer Kouzis separated the two bags by about four to five feet. There were other objects on either side of the two seized bags and between them. Officer Kouzis then led Stuey to the right end of the line of objects and slowly walked Stuey down the line. Stuey sniffed each item and then focused on the first seized bag and alerted at that bag. Officer Kouzis then continued with Stuey down the line of objects. Again, Stuey sniffed each item and then focused on the second seized bag, where he alerted for a second time. At the hearing, the Government proved that Stuey sat down twice, including when he sniffed the bag Pena had carried off the bus. This provided probable cause for Pena's arrest.

I. The Investigatory Stop Was Lawful.

Pena first argues that the Government did not have reasonable suspicion to stop Pena and investigate his activities. The Fourth Amendment prohibits "unreasonable searches and seizures" by the Government. U.S. Const. Amend. IV. Its protections extend to any seizure of persons, even

6

those that do not constitute an arrest. Terry v. Ohio, 392 U.S. 1, 16 (1968).

"Terry stops are lawful custodial interrogations that do not rise to the level of an arrest and are justified when an officer has reasonable suspicion to believe that criminal activity has occurred or is about to occur." Soukaneh v. Andrzejewski, 112 F.4th 107, 117 (2d Cir. 2024) (citation omitted). "Reasonable suspicion demands less than is necessary for probable cause, and is satisfied as long as authorities can point to specific and articulable facts which, taken together with rational inferences from those facts, provide a particularized and objective basis for suspecting legal wrongdoing." Id. (citation omitted). This "standard takes into account the totality of the circumstances;" the reasonable suspicion necessary to justify an investigatory stop "is dependent upon both the content of information possessed by police and its degree of reliability." Navarette v. California, 572 U.S. 393, 397 (2014) (citation omitted).

Contextual considerations, such as "the officers' assessment of an individual's nervous or evasive behavior" may be "pertinent in establishing reasonable suspicion." United States v. Hagood, 78 F.4th 570, 576 (2d Cir. 2023) (citation omitted). Finally, a "determination that reasonable suspicion exists need not rule out the possibility of innocent conduct."

7

Id. at 579 (citation omitted).  "Conduct as consistent with innocence as with guilt may form the basis for an investigative stop where there is some indication of possible illicit activity."  Id. (citation omitted).

The DEA had strong evidence that Rosario was engaged in narcotics trafficking and that his trips to North Carolina were part of that endeavor.  They also had strong evidence to believe that Pena was assisting Rosario in that activity.  The agents had seen the two men together on several occasions, and they had seen Pena return with Rosario from a bus trip to North Carolina.  They had seen the bag which Rosario was carrying on that trip taken to the building in which Pena lived.  Stuey later alerted to that bag.  As significantly, on the date of Pena's arrest he was again returning with Rosario by bus from a trip to North Carolina.  On this occasion, both Rosario and Pena exited the bus carrying heavy bags.  These circumstances supplied reasonable suspicion that Pena as well as Rosario was engaged in illegal drug activity.

II.  The Investigatory Stop Did Not Ripen into a Premature De Facto Arrest.

Pena next argues that his detention by the Government agents amounted to an arrest and that the Government had no probable cause for that arrest.  An investigatory stop may "ripen into a de facto arrest, which then must be based on

8

probable cause." Soukaneh, 112 F.4th at 118 (citation omitted). A court considers the following factors in deciding whether a Terry stop is so intrusive as to become a de facto arrest:

> (1) the length of time involved in the stop; (2) its public or private setting; (3) the number of participating law enforcement officers; (4) the risk of danger presented by the person stopped; and (5) the display or use of physical force against the person stopped, including firearms, handcuffs, and leg irons.

United States v. Lefebvre, 117 F.4th 471, 474 (2d Cir. 2024) (citation omitted). No one factor is determinative. Id. at 475. Nevertheless, "to satisfy the reasonableness standard for a Terry stop," the officers conducting stops on less than probable cause "must employ the least intrusive means reasonably available to effect their legitimate investigative purposes." Id. (citation omitted).

In applying that inquiry, a court should be mindful of the Supreme Court's admonition that,

> [a] creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. But the fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not, itself, render the search unreasonable. The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.

United States v. Bailey, 743 F.3d 322, 340 (2d Cir. 2014) (quoting United States v. Sharpe, 470 U.S. 675, 686-87 (1985)).

Applying these principles, "courts have upheld a range of restraints incident to a Terry stop, from the patdown at issue in Terry itself, to the drawing of firearms, to the use of handcuffs, all depending on the circumstances presented." Id. And "even though handcuffs are generally recognized as a hallmark of a formal arrest, not every use of handcuffs automatically renders a stop an arrest requiring probable cause to satisfy Fourth Amendment reasonableness." Id. (citation omitted). Instead, the "relevant inquiry is whether police have a reasonable basis to think that the person detained poses a present physical threat and that handcuffing is the least intrusive means to protect against that threat." Id.

Moreover, under this multifactor inquiry, the mere fact that a Terry stop lasts longer than a few minutes does not alone convert the stop into a de facto arrest. Courts have upheld investigatory stops of a variety of lengths, declining to adopt a bright line rule. See, e.g., Lefebvre, 117 F.4th at 475 (20 minutes to transport defendant to police barracks for witness identification); United States v. Tehrani, 49 F.3d 54, 61 (2d Cir. 1995) (30-minute detention while confirming detainees' immigration status is not "per se" too long). For a stop to be conducted in "an appropriate manner," it must be "no longer in duration than necessary to confirm or dispel officers'

reasonable suspicions." United States v. Patterson, 25 F.4th 123, 141 (2d Cir. 2022).

The Government has shown that it used the least intrusive and most expeditious means at its disposal to investigate whether Pena was engaged in illegal activity on June 7. Stuey and his handler were waiting at the location at which the DEA agents believed the bus would stop so that any bags carried off the bus could be promptly examined by Stuey. As soon as Pena, Rosario and the third man had been secured, Officer Kouzis found a location suitable for Stuey to sniff the two bags that Pena and Rosario had carried off the bus. Officer Kouzis separated the two bags from each other and led Stuey along a path to sniff a variety of objects as well as the two bags.

Once Stuey alerted the officers that Pena's bag had the odor of narcotics, the officers had probable cause to place Pena under arrest, and Pena does not argue otherwise. See United States v. Bodnar, 37 F.4th 833, 840 & n.29 (2d Cir. 2022). The relatively brief detention of Pena after he exited the bus and before Stuey sat down next to the bag Pena had carried off the bus was a lawful investigatory stop and not a de facto arrest.

The defendant argues that the stop became a de facto arrest when he was placed in handcuffs. While the use of handcuffs is frequently associated with an arrest, in this case it permitted Stuey to quickly sniff the bag Pena had been carrying while

11

restraining Pena. In these circumstances, the use of handcuffs did not exceed "the degree of intrusion necessary to confirm or dispel the officers' reasonable suspicion" that Pena as well as Rosario was engaged in illegal drug activity. <u>Lefebvre</u>, 117 F.4th at 475 (citation omitted).

### Conclusion

The defendant's February 26, 2025 motion to suppress is denied.

Dated:   New York, New York
         April 22, 2025

```
                              _____
                                    DENISE COTE
                              United States District Judge
```

12